IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

                                    :

VIRGIL HILL

                                    :

    v.                              :   Civil Action No. DKC 2005-1037

                                    :

CECILE D. BARKER

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract and misrepresentation case is the motion of Defendant Cecile D. Barker for summary judgment. (Paper 30).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the court will deny Barker's motion.

**I.  Background**

Plaintiff Virgil Hill, a boxer, alleges that Cecile Barker entered into and subsequently breached a contract to act as a promoter for Hill's boxing career.  Specifically, Hill contends  in his complaint that Barker entered into a contract with Hill to promote Hill's boxing matches beginning on December 9, 2000, and breached that contract when he "failed to either set up any boxing matches . . . or pay the agreed upon amounts if no bouts were set." (Paper 2, at 2-3).  Hill also contends that Barker misrepresented "himself . . . as someone with the ability to promote professional boxers, and promised a certain income to [Hill]," and that Hill was

injured by his justified reliance on those misrepresentations. (Paper 2, at 3-4).

The following facts are based on the record and are either uncontested or presented in the light most favorable to Hill.

Sometime in September 2000, Barker, Hill, and another individual, Jeffrey N. Jackson ("Jackson"), executed a one-sentence, written agreement ("the 1223 agreement") while spending time at the 1223 Club in the District of Columbia.[1] This written agreement provides that Barker and Jackson are authorized "to represent [Hill] in any and all matters relating to [his] boxing career."[2] (Paper 30, Ex. 2). Barker paid Hill $25,000 by check, although the parties disagree about the purpose of this and subsequent payments. Hill stated in his deposition that Barker told him at this point that "we'll work out the details later." (Paper 30, Ex. 22, Hill Dep., at 144).

Later, on September 12, 2000, Hill and Jackson signed a written contract for boxing promotion ("the Promoter/Boxer Agreement") in Las Vegas, Nevada. This contract bears the

---

[1] The parties do not state the exact date of the agreement, and the written agreement itself is undated. Based on the parties' submissions, the court infers that it was signed in September 2000 before the September 12, 2000 execution of the Promoter/Boxer Agreement.

[2] The parties disagree about the relationship between Barker and Jackson. Hill asserts that the two represented themselves as business partners and were friends. (Paper 40, at 9 n.6). Barker maintains that he and Jackson were acquaintances. (Paper 40, Ex. A, Barker Dep., at 16-17).

signatures of Hill and Jackson, and it purports to be an agreement between Hill and "JACKSON" a term the contract defines as "JEFFREY N. JACKSON . . . d/b/a 'WORLD'S FINEST PROMOTIONS,' a Washington, District of Columbia, Limited Liability Company." (Paper 30, Ex. 1). The Promoter/Boxer Agreement gives "JACKSON" the exclusive right to "secure, arrange and promote all Bouts requiring [Hill's] services as a professional boxer" during a term of at least three years commencing when Hill "enters the ring" to fight "Tiozzo for the WBA Cruiserweight Championship." *Id.* The Promoter/Boxer Agreement also requires "JACKSON" to "promote at least three (3) Bouts requiring [Hill's] services during each year of the term hereof." *Id.* The agreement provides that "JACKSON" would advance up to $25,000 in training expenses per bout to Hill and sets purse amounts that Hill would be paid for each bout promoted under the agreement. This contract contains a choice of law provision, designating District of Columbia law.

Hill contends that Barker was present by telephone at the time the Promoter/Boxer Agreement was executed. Hill also asserts that he and Barker reached an agreement during this conversation. Hill stated in his deposition that "Cecile Barker is the one who guaranteed everything verbally over the phone . . ." with respect to the Promoter/Boxer agreement. (Paper 30, Ex. 22, Hill Dep., at 152). Hill also explains in his declaration what he understood Barker's "guarantee" of the Promoter/Boxer Agreement to mean.

"[I]t was represented to me that Jeffrey Jackson would perform the day-to-day work in promoting me in boxing, and that Mr. Barker would have a supervisory, more general decision-making role in my promotion and would be financing whatever was needed for the promotion and my expenses and compensation." (Paper 40, Ex. I, Hill Decl. ¶ 7).

By letter dated November 15, 2000, Barker sent Hill a detailed proposed contract under which Barker would serve as Hill's manager ("the Manager/Boxer Agreement"). Barker drew up the Manager/Boxer agreement and presented it to Hill for execution as an attachment to a signed letter. Hill refused to sign the agreement. This decision was communicated to Barker through a letter on Hill's behalf, written by Bill Sorenson and dated November 22, 2000.[3] Sorenson's letter rejected the agreement as inconsistent with previous discussions. Barker claims that the purpose of this agreement was to formalize the results of his conversations with Hill and to spell out additional terms based on the 1223 agreement. Barker also asserts that payments he made to Hill and his efforts to arrange bouts for Hill were in anticipation of finalizing this agreement and did not constitute performance under the alleged boxing promotion agreement.

---

[3] There is some inconsistency in the record as to Sorenson's title and role in assisting Hill, but it is clear that Sorenson assisted Hill in some capacity in negotiations and correspondence with Barker and Jackson.

On December 9, 2000, Hill won the World Boxing Association (WBA) Cruiserweight Championship title in the bout referenced as the start date for the Promoter/Boxer Agreement.[4] After that time, Barker worked to negotiate bouts for Hill and met with Hill at least once to discuss these arrangements.  Barker also made additional payments to Hill that totaled at least $30,000.[5]

Hill did not fight again until February 23, 2002, in a bout organized pursuant to WBA rules and promoted by another promoter selected in a WBA bid process.  During 2001, because no bouts were scheduled, Hill did not make any money from boxing purses.  As a result Hill stopped his training and took out loans to cover living expenses.

Hill initiated this action in the Circuit Court for Prince George's County, Maryland on December 8, 2004, asserting claims for breach of contract and negligent misrepresentation.  Barker removed

---

[4] Barker contests Hill's interpretation of this clause of the Promoter/Boxer Agreement.

[5] The record is not entirely clear about the total amount that Barker paid Hill.  Barker made a $25,000 payment at the time the 1223 agreement was executed.  (Paper 30, Ex. 22, Hill Dep., at 192; paper 40, Ex. A, Barker Dep., at 98-99).  Barker admitted in his deposition that he paid at least $30,000.  (Paper 40, Ex. E, Barker Dep., at 36).  In the answer to the complaint, however, Barker admits to having paid Hill a total of $75,000.  (Paper 11, ¶ 8).  Hill asserts that discovery into the timing and amounts of payments is ongoing.  (Paper 40, at 4).

the case to this court on April 15, 2005, and filed this motion for summary judgment on December 14, 2005.[6]

Barker argues that he is entitled to summary judgment on both of the claims because of (1) the statute of limitations and (2) the statute of frauds.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba*

---

[6] On May 20, 2002, Hill initiated a suit in the United States District Court for the District of Columbia against Jackson and World's Finest Promotions for breach of the Promoter/Boxer Agreement.  Hill obtained a default judgment against Jackson in that action on April 12, 2005.

*Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Both of the issues raised by Barker are affirmative defenses, which must be pled and proven by him.  The inquiry involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson*, 477 U.S. at 252.  Because Barker bears the burden, he "must remove genuine doubt from the issue altogether."  *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation marks omitted), *cert. denied*, 530 U.S. 1204 (2000); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation marks and italics omitted).  Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's [defenses] and the non-movant's response fails to raise a genuine issue of material fact as to any one element."  *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).

## III.  Statute of Limitations

Under Maryland law, a civil action "shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."  Md. Code Ann., Cts. & Jud. Proc. § 5-101

(2002).[7]  Neither party disputes that the three-year limitations period provided in section 5-101 applies to this action.  Barker contends that Hill was on notice of the existence of any cause of action more than three years prior to the date this action was filed.

## A.  Breach of Contract

Under Maryland law, the defendant bears the burden of establishing a statute of limitations defense.  *O'Hara v. Koven*s, 305 Md. 280, 286 (1986).  In a suit for breach of contract, Maryland's applicable statute of limitations "begins to run from the date of the breach, for it is then that the cause of action accrues and becomes enforc[ea]ble."  *Mayor of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157, *cert. denied*, 423 U.S. 1017 (1975).  "The determination of when a breach of contract occurs usually depends on the nature of the promises made in the contract and the times for performing those promises."  *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 649 (1999).

The date of accrual of a cause of action for limitations purposes is modified by the doctrine of discovery, which provides that "a cause of action accrues only when the claimant knows or should know of the wrong."  *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 445 (2000).  "[H]ow the discovery rule operates in

---

[7] The parties agree that the Maryland statute of limitations should apply to this case.  (Paper 30, at 14; paper 40, at 17).

different types of cases is for the court to determine." *O'Hara*, 305 Md. at 298.   The Court of Special Appeals of Maryland has observed that "while the discovery rule may . . . delay the accrual of a contract matter, it cannot operate to make such an action accrue earlier than the date of the breach or anticipatory breach." *Singer Co., Link Simulation Sys. Div. v. Balt. Gas & Elec. Co.*, 79 Md.App. 461, 473 (1989).

Hill asserts in his complaint that Barker's alleged contract to promote Hill's boxing career was to begin on December 9, 2000. (Paper 2, at 2).   Although not articulated in the complaint, Hill apparently contends that Barker breached his promise to promote boxing matches when no fights were promoted one year after December 9, 2000.[8]   "Barker breached the contract . . . as of December 10, 2001 – one year into the Promotion Agreement.   On that date . . . no bouts were set . . . ."  (Paper 40, at 10).   The Promoter/Boxer Agreement also specifies that its obligations begin on December 9, 2000, the date of the Hill-Tiozzo bout.[9]  (Paper 30, Ex. 1, at 1 ). Because Hill is the non-movant, this court will assume in deciding this motion the truth of Hill's statements that Barker's obligation

---

[8]  Hill's interrogatory responses are also unclear as to whether Barker's obligations stem from the 1223 agreement, the Promoter/Boxer Agreement, both of these writings, or some other agreement.   (Paper 30, ex. 21, at 5).

[9]  Barker argues that the Promoter/Boxer Agreement could be interpreted to require an earlier start date (paper 30, at 15 n.64), but for purposes of this motion, this dispute will be construed in the manner most favorable to Hill, the non-movant.

to promote boxing matches began on December 9, 2000 and required Barker to promote boxing matches for Hill within one year.  The one-year anniversary, then, was either December 8 or December 9, 2001. This action was filed on December 8, 2004.

Barker argues that various facts and circumstances put Hill on notice before the expiration of the first year that no bouts would be promoted and that breach was inevitable.  As a result, Barker reasons that Hill was on inquiry notice of an inevitable breach of any agreement well before the one-year time for performance asserted by Hill had expired.

For example, Sorenson wrote a series of three letters to Jackson, signed as Hill's manager, dated July 2, 2001, August 9, 2001, and August 30, 2001, expressing frustration that no bouts had been arranged.  Hill contends that he did not know the contents of these letters at the time they were written. (Paper 40, Ex. I, Hill Decl., at 1).

Hill has stated that he "made attempts late in the first year of the promotional contract to contact Mr. Barker by telephone to discuss compensation under the contract.  I did not receive return telephone calls from Mr. Barker." (Paper 40, Ex. I, Hill Decl. ¶ 4).  Hill claims, however, that he was unaware of Barker's misrepresentations and did not consider their agreement to be breached until December 10, 2001, when he became aware of the misrepresentations and considered the contract breached:

11

> I believed that Mr. Barker breached the promotional contract, at [sic] December 10, 2001, when no bouts were set, Mr. Barker had not responded to my telephone calls, and no attempts were made in accordance with the boxing industry practice to compensate me for bouts not set.
>
> I believed that Mr. Barker had made misrepresentations to me, at [sic] December 10, 2001, when no bouts were set, Mr. Barker had not responded to the telephone calls, and no attempts were made in accordance with the boxing industry practice to compensate me for bouts not set.

(Paper 40, Ex. I, Hill Decl., at 1-2 ¶ 5-6).  These statements raise a genuine dispute of fact as to when Hill became aware of any breach of the alleged agreement.

Barker cannot demonstrate that the limitations period began to run earlier than this time.  The cases Barker cites for the proposition that Maryland's statute of limitations starts to run from the date that the plaintiff acquires inquiry notice of a potential cause of action (paper 30, at 14-15) are all distinguishable from the situation raised in this case.  In each of these cases, the facts supporting the plaintiff's cause of action had all occurred, and the only remaining question was whether the plaintiff was aware of sufficient facts to create inquiry notice. *See, e.g.*, *Doe v. Archdiocese of Wash.*, 114 Md.App. 169 (1997) (analyzing when plaintiff became aware of wrongfulness of alleged past molestation).  In this case, the opposite is true.  Any alleged breach of an agreement by Barker was not complete for statute of limitations purposes until the time for performance concluded, and

12

Hill appears to allege that the time for performance did not conclude until one year after December 9, 2000. The discovery rule can delay the date on which the limitations period begins to run on a breach of contract action, but cannot accelerate it ahead of the date on which performance was due under the contract. *Singer Co.*, 79 Md.App. at 473. Thus, if the actual breach did not occur until a year passed, as Hill asserts, then it is irrelevant generally when Hill might have had knowledge that breach was likely.

There is another doctrine, that of anticipatory breach, that Barker's argument may implicate. Barker argues that under Maryland law any breach of a promise to promote Hill's boxing matches occurred at the time Hill learned that performance would not occur within the time for performance set by the agreement. Barker relies on *Mathis v. Hargrove*, 166 Md.App. 286 (2005), but this case does not support his position. The Court of Special Appeals' decision in *Mathis* concerned an anticipatory breach of contract based on an express statement by the defendant. *Id.*, at 319. The court held that the contract was breached in that case only when the defendant affirmatively told the plaintiff that the defendant would not perform as required by the contract. *Id.* Under clearly established Maryland law, an anticipatory breach of a contract can occur when a party "definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract[,] . . . [b]ut [such a] refusal to perform must be

13

positive and unconditional." *Weiss v. Sheet Metal Fabricators,*
*Inc.*, 206 Md. 195, 203-04 (1955).   No affirmative act by which
Barker definitely or positively refused to perform is alleged in
this case.   The circumstances on which Barker relies to argue that
Hill should have known that bouts would not be promoted within one
year of the alleged agreement, such as the passage of time, the lack
of any scheduled bout, and Hill's usual recovery period between
bouts, are not the kind of definite, positive acts required to
establish anticipatory breach of a contract.   *See id.*

## B.  Negligent Misrepresentation

Hill's negligent misrepresentation claim is based on statements
allegedly made by Barker in the fall of 2000.[10]   Hill suffered
damages   from   any   misrepresentation   when   he   relied   on   the
representations and as a result lost revenue in the period after the
December  9,  2000,  Hill-Tiozzo  bout  when  no  further  bouts  were
arranged or promoted.   Barker claims that Hill was on notice of any
negligent misrepresentations by some time in the summer or fall of
2001.   Hill   counters   by   asserting   that   he   was   unaware   of   any
misrepresentations until December 10, 2001, the same day he asserts
he became aware of the alleged breach of contract.   (Paper 40, Ex.
I,  Hill  Decl.,  at  2  ¶  6).   Barker  cites  facts  that  allegedly

---

[10]  It  is  unclear  from  Hill's  complaint  exactly  what  the
statement  was  that  this  claim  is  based  on,  or  exactly  when  the
challenged statements were made.   Resolution of this issue is not
necessary to decide the present motion.

demonstrate that Hill should have become suspicious of any alleged misrepresentations as it became clear that no bouts involving Hill were being arranged or promoted.  (Paper 30, at 8-11, 14-16).  The evidence offered by Barker falls short of meeting Barker's burden of proof on this issue.

Maryland applies the discovery rule and the related concept of "inquiry notice," under which "[t]he statute of limitations will begin to run[] when the plaintiff has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448-49 (1988) (quoting *O'Hara*, 305 Md. at 302).  Under Maryland law, for purposes of initiating the limitations period, "deceit actions accrue when the wrong is discovered or when with due diligence it should have been discovered." *James v. Weisheit*, 279 Md. 41, 45 n.4 (1977). Maryland courts have continued to apply this principle since the concept of inquiry notice was extended to all cases by the Court of Appeals in 1981.  *See O'Hara*, 305 Md. at 286-88.

On a defendant's motion for summary judgment based on a statute of limitations defense, "the defendant[] ha[s] the burden of proving that more than three years before filing suit (1) the plaintiff[] knew of facts sufficient to cause a reasonable person to investigate further, and (2) a diligent investigation would have revealed that

the plaintiff[] [was the] victim[] of . . . the alleged tort."
*Pennwalt Corp.*, 314 Md. at 449.  "[T]he question of whether the
plaintiff[] [was] on inquiry notice of [his] cause of action more
than three years before filing suit [is] a question of fact
determinative of the limitations defense," and summary judgment
cannot be granted unless the defendant's evidence shows that
"reasonable men could not find otherwise."  *Id.* at 450.

Barker points to evidence that Hill either was or should have
been aware of any misrepresentations more than three years prior to
filing suit.  Barker argues that Hill should have been and perhaps
was aware that no bouts were scheduled as 2001 progressed, given
that Hill had never fought with less than one month between fights.
(Paper 30, Ex. 22, Hill Dep., at 55).  In early July 2001 Hill had
to discontinue training in order to find other employment.  (Paper
30, Ex. 5).  Hill made telephone calls to Barker "late in the first
year of the promotional contract" and failed to get any response.
(Paper 40, Ex. I, Hill Decl. ¶ 4).  Barker also notes statements in
Sorenson's letters to Jackson that demonstrate that Sorenson had
begun to doubt whether Jackson was an able promoter as early as
August 2001 (paper 30, Ex. 6, at 1) and noted that "[I]t is now
apparent that we will not have three fights within the year."
(Paper 30, Ex. 6, at 1).

Hill denies that he was or should have been aware of any
misrepresentation more than three years before this action was

filed.  Hill declares that he "first believed that Mr. Barker had made misrepresentations to me, at [sic] December 10, 2001, when no bouts were set, Mr. Barker had not responded to the telephone calls, and no attempts were made in accordance with the boxing industry practice to compensate me for bouts not set." (Paper 40, Ex. I, Hill Decl. ¶ 6).  Hill also denies that he knew of Sorenson's letters at the time they were written.  (Paper 40, Ex. I, Hill Decl. ¶ 3).

Based on the record, there is a genuine dispute of material fact as to when Hill did or should have become aware of sufficient facts to put him on inquiry notice of a potential negligent misrepresentation claim.

## V.  Statute of Frauds

Barker contends that the statute of frauds applies to both counts and that no writing sufficient to satisfy the statute of frauds memorializes Barker's alleged promise to promote bouts involving Hill.[11]  Hill makes several arguments to counter Barker's statute of frauds defense.  First, Hill argues that the statute of frauds does not apply to either claim.  Second, Hill asserts that, even if the statute of frauds does apply, several writings exist

---

[11] Barker asserts that Hill's negligent misrepresentation claim is barred by the statute of frauds as an action to enforce a promise that is not memorialized by a sufficient writing. (Paper 30, at 18 n.66).  Because the defendant's motion for summary judgment will be denied with respect to Hill's breach of contract claim, it is unnecessary to decide at this time whether Hill's negligent misrepresentation claim would also be barred if the statute of frauds later bars his breach of contract claim.

which may satisfy the statute of frauds.[12]  Finally, Hill asserts
that, even if the statute of frauds applies and the writing
requirement is not satisfied, Barker is estopped from raising a
statute of frauds defense.  Hill argues that Barker is estopped from
raising the defense both because Barker allegedly partially
performed his obligation (partial performance estoppel) and because
Barker committed fraud on Hill resulting in the lack of a writing
(fraud estoppel).

To defeat Barker's motion for summary judgment, Hill only needs
to forecast sufficient evidence to generate a single genuine dispute
of material fact.  He contends that, under District of Columbia law,
Barker partially performed his obligations under the alleged boxing
promotion agreement by making payments to Hill and working to
arrange bouts featuring Hill.

Barker responds that Maryland law applies to the statute of
frauds defense and that Maryland law would bar assertion of partial
performance estoppel in a suit seeking only money damages, such as
this case.  Second, he argues that even if District of Columbia law
applies, partial performance estoppel would not bar a statute of
frauds defense in a suit for money damages, as a matter of law.
Finally, Barker contends that his conduct does not constitute

---

[12] The court does not further address these claims because the
resolution of Hill's partial performance estoppel argument
eliminates the need to consider these arguments in order to resolve
the present motion.

sufficient partial performance under the alleged agreement to trigger partial performance estoppel.

## A.  Choice of Law

The determination of which law applies is important to resolving Hill's estoppel argument.  The District of Columbia recognizes partial performance estoppel as a bar to a statute of frauds defense in suits, like this one, that seek only money damages, while Maryland may not.  In a diversity case, this court must apply the choice of law rules of Maryland, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313, U.S. 487, 496 (1941). The Court of Appeals of Maryland has not addressed the question of whether the statute of frauds is substantive or procedural.

The parties dispute whether the Court of Appeals of Maryland would consider the statute of frauds procedural, in which case Maryland law would apply as the forum state, or substantive, in which case the court would apply Maryland's choice of law rules to determine which state's statute of frauds to apply.  The parties also disagree as to whether Maryland's choice of law rules would result in the application of Maryland or District of Columbia law.

Barker cites *Cambridge, Inc. v. Goodyear Tire & Rubber Co.*, 471 F.Supp. 1309, 1312 (D.Md. 1979), as authority suggesting that the statute of frauds might be procedural, but *Cambridge* provides little, if any, support for that proposition.  The *Cambridge* court applied Maryland law to an alleged contract without explaining its rationale or noting any argument by either party for a contrary

19

choice of law, and cited *American Secretary & Trust Co. v. Fletcher*, 490 F.2d 481, 484 (4th Cir. 1974), as authority for this result. *American Secretary & Trust Co.* provides that the law of the forum state is the default choice of law when nothing in the record indicates that a contrary choice of law should be evaluated. *Am. Sec'y & Trust Co.*, 490 F.2d at 484. In this case, there is an allegation that application of Maryland law may not be appropriate, so the default rule is not applicable.

Maryland's Court of Special Appeals has suggested that the statute of frauds may be a substantive provision subject to a choice of law analysis. *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md.App. 476, 492 (2002) (conducting a choice of law analysis to determine which state's statute of frauds to apply but concluding that Maryland law would apply under the facts of the case); *see also Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 394, *cert. denied*, 295 Md. 736 (1983) (contrasting the statute of frauds with "the procedural defense of laches" outside the choice of law context). The Court of Special Appeals offers a persuasive rationale that the statute of frauds goes to the substance of whether an enforceable agreement exists, *Cavalier Mobile Homes, Inc.* 53 Md.App. at 394, and has applied Maryland's choice of law principles to determine which statute of frauds to apply, *Konover Prop. Trust, Inc.* 142 Md.App at 492.

Given this persuasive authority, and because the parties point to no Maryland authority to the contrary, this court predicts that the Court of Appeals would rule that the statute of frauds is substantive for choice of law purposes.   As a result, it is necessary to conduct a choice of law analysis under Maryland's choice of law principles.

When a choice of law analysis is conducted, "[a]bsent a choice-of-law provision in the contract, Maryland applies the law of the jurisdiction where the contract was made to matters regarding the validity and interpretation of contract provisions."   *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 173 n.5 (4th Cir. 2002) (citing *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560 (1995)).   When the contract contains a choice of law provision, that provision will be honored unless "the chosen state has no substantial relationship to the parties" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest . . . in the determination of the particular issue. . . ."   *Nat'l Glass, Inc. v. J.C. Penny Props., Inc.*, 336 Md. 606, 610-11 (quoting Restatement (Second) Conflict of Laws § 187(2) (Supp. 1989)).

Hill asserts that the choice of law clause contained in the Promoter/Boxer Agreement was part of the promise Barker made to Hill, and that its selection of District of Columbia law (paper 30,

Ex. 1, at 6) should be honored.[13]  Barker argues that the contract was made in Maryland, because Hill alleges Barker made promises over the telephone from his Maryland office while Hill and Jackson executed the Promoter/Boxer Agreement in a Nevada hotel room.  While his position on this fact is not entirely clear, Barker appears to contest whether any promise he made to promote boxing matches for Hill encompassed the Promoter/Boxer Agreement's choice of law clause.  (Paper 42, at 20 n.14).

This factual dispute is genuine, and it is material because resolution in favor of Hill would support application of District of Columbia law.  Barker makes no argument that application of District of Columbia law to this defense would contravene fundamental Maryland public policy.  The 1223 Agreement, the initial agreement between the parties, was signed by Hill, Barker, and Jackson in the District of Columbia.  This appears to be a reasonable rationale for the parties to select District of Columbia law to apply to the alleged boxing promotion agreement.

**B.  The Legal Status of Partial Performance Estoppel**

Barker asserts that the District of Columbia does not allow a plaintiff seeking monetary damages to benefit from partial performance estoppel.  He relies on a footnote in *Landow v.*

---

[13]  Hill stated in his deposition that "[t]his document [referring to the Promoter/Boxer Agreement] – this document is what Cecile said. . . .  [W]hatever the contract said is what Cecile said that they would do for me."  (Paper 30, Ex. 22, Hill Dep., at 159–60).

*Georgetown-Inland West Corp.*, 454 A.2d 310, 313 n.4 (1982), for this proposition. In footnote 4, the *Landow* court observes that "even were the buyer able to prove his alleged damages, his sole injury is monetary and fully compensable at law. It is well established that the equitable remedy of estoppel is, therefore, not appropriate." 454 A.2d at 313 n.4.

Barker admits, however, that the District of Columbia Court of Appeals has more recently allowed a plaintiff seeking "legal relief in the form of money damages" to argue estoppel against a defendant who partially performed under an oral agreement and seeks to assert a Statute of Frauds defense to enforcement of that agreement. *Fitzgerald v. Hunter Concessions, Inc.*, 710 A.2d 863, 865 n.5 (D.C. 1998); *see also D.C. Hous. Fin. Agency v. Harper*, 707 A.2d 53, 56-57 (D.C. 1998) (allowing assertion of partial performance estoppel in an action for monetary damages). While these cases do not acknowledge or distinguish footnote 4 in *Landow*, the present course of the District of Columbia Court of Appeals appears to be to allow the assertion of estoppel as a bar to a statute of frauds defense even in cases seeking only money damages.

## C. Facts Relevant to Part Performance Estoppel

Barker argues that the evidence relied on by Hill only reflects his conduct in anticipation of finalizing the Manager/Boxer Agreement with Hill. Barker made payments to Hill and allegedly also made efforts to set up bouts involving Hill. Barker paid Hill

23

at least $30,000 after the Hill-Tiozzo bout and after Hill's November 2000 rejection of the Manager/Boxer Agreement. (Paper 40, Ex. E, Barker Dep., at 36). Cary Redlin, Hill's assistant, stated in her deposition that she participated in a telephone call with Barker and Hill during which Barker agreed to pay Hill's training expenses and during which "we were trying to line up [Hill]'s world title fight in January . . . in North Dakota." (Paper 40, Ex. C, Redlin Dep., at 55-56). Milton Chawsky also testified that he worked with Barker attempting to arrange bouts for Hill and that Barker was "very much involved in practically all the discussions with Jeffery [Jackson] and myself." (Paper 40, Ex. F, Chawsky Dep., at 16-17, 23). Carla Hill also states that at a meeting between Barker and Mr. and Mrs. Hill after the Hill-Tiozzo bout, Barker stated that he would "get the fights" for Hill. (Paper 40, Ex. B, Carla Hill Dep., at 69).

Barker disputes whether this conduct was intended as performance under any alleged agreement to promote Hill's boxing career and explains that he was actually paying Hill and working to set up bouts in anticipation of reaching agreement with Hill on the Manager/Boxer Agreement. (Paper 42, at 21-23). Barker stated that "[i]t was like he [Hill] hadn't rejected my managerial contract." (Paper 40, Ex. E, Barker Dep., at 36-37).

Barker also argues that Hill's part performance estoppel argument fails as a matter of law because Barker's conduct is not

24

definitively tied to any promise to promote Hill, but instead reflects only performance in anticipation of executing the Manger/Boxer Agreement.  (Paper 42, at 21-22).  The only District of Columbia case that Barker relies on for this proposition requires only that performance be "under" the alleged agreement to bar assertion of a statute of frauds defense.  *Landow*, 454 A.2d at 313 n.3.

Hill has forecast evidence sufficient to raise a genuine dispute of material fact with respect to partial performance estoppel.  A reasonable person could find that Barker's alleged payments to Hill, after the Manager/Boxer Agreement was rejected; Barker's work to secure bouts for Hill; and his conversations with Mr. and Mrs. Hill and with Ms. Redlin constituted partial performance "under" an agreement with Hill sufficient to estop Barker from asserting a statute of frauds defense.  *Id*.  Summary judgment in favor of Barker on the basis of the statute of frauds would thus be improper.

## V.  Conclusion

For the foregoing reasons Defendant's motion for summary judgment will be denied.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge