IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

VIRGIL HILL

:

v.                          : Civil Action No. DKC 2005-1037

:

CECILE D. BARKER

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract and negligent misrepresentation case are Defendant Cecile D. Barker's motion for summary judgment (Paper 100), partial motion to dismiss (Paper 98), three motions to seal (Papers 97, 99, and 100), and Plaintiff Virgil Hill's renewed motion to seal (Paper 106). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion for summary judgment will be denied in part and granted in part, Defendant's motion to dismiss will be denied, and both parties' motions to seal will be granted.

**I.  Defendant's Motion for Summary Judgment**

Plaintiff Virgil Hill, a professional boxer, alleges that he and Defendant Cecile D. Barker entered into a contract pursuant to which Defendant would act as a promoter for Plaintiff's boxing career. According to Plaintiff, the contract was to take effect after a December 9, 2000, boxing match between Plaintiff and Fabrice Tiozzo for the World Boxing Association ("WBA")

Cruiserweight title.   Plaintiff was victorious in that match, thereby becoming the WBA Cruiserweight champion.   As a result, he became highly marketable and eligible for lucrative purses in future matches.   Plaintiff alleges that Defendant failed to arrange any matches, however, and that he did not pay Plaintiff the amounts specified by the contract if no matches were scheduled.   This law suit, alleging breach of contract and negligent misrepresentation, followed.

### A.   Background

At some point in September 2000, Defendant, Plaintiff, and Jeffrey N. Jackson executed a one-sentence, written agreement at a Washington, D.C., nightclub called "Club 1223" ("the 1223 Agreement").   This agreement purportedly authorized Defendant and Jackson "to represent [Plaintiff] in any and all matters relating to [his] boxing career." (Paper 30, Ex. 2).[1]   At the same time, Defendant paid Plaintiff $25,000, by check, although the parties disagree as to the purpose of this and subsequent payments. Plaintiff acknowledged in his deposition that the agreement lacked detail, but claimed that Defendant told him and Jackson, "we'll work out the details later." (Paper 30, Ex. 22, Plaintiff Dep. at 144).

---

[1] The parties do not state the exact date of the agreement, and the written agreement itself does not indicate a date.   Based on the parties' submissions, however, it may be inferred that it was executed between September 1 and September 12, 2000.

On September 12, 2000, in Las Vegas, Nevada, Plaintiff and Jackson executed an agreement related to promotion of Plaintiff's boxing career ("the Promoter/Boxer Agreement").  This written contract between Plaintiff and Jackson "d/b/a 'World's Finest Promotions,' a Washington, District of Columbia, Limited Liability Company" granted Jackson "the sole and exclusive right to secure, arrange and promote all Bouts requiring [Plaintiff's] services as a professional boxer" for a term of at least three years.  (Paper 30, Ex. 1).  By its plain language, the agreement was to commence "when, and only if, [Plaintiff] enters the ring" for the scheduled boxing match with Tiozzo.  Under the agreement, Jackson was to promote at least three boxing matches during each year of the contract, advance Plaintiff up to $25,000 per bout in training expenses, and set purse amounts that Plaintiff would be paid for each bout that Jackson promoted.  The contract also contained a choice of law provision, requiring that any dispute arising under the agreement be governed by the law of the District of Columbia.

According to Plaintiff, Defendant was not physically present at the meeting when the Promoter/Boxer Agreement was executed, but led a discussion as to its terms by telephone.  In his deposition, Plaintiff identified Defendant as "the one who guaranteed everything verbally over the phone" with respect to the agreement. (Paper 30, Ex. 22, Plaintiff Dep. at 152).  Plaintiff also submitted a declaration explaining that he understood Defendant's

"guarantee" of the Promoter/Boxer Agreement to mean that "Jeffrey Jackson would perform the day-to-day work in promoting me in boxing, and that [Defendant] would have a supervisory, more general decision-making role in my promotion and would be financing whatever was needed for the promotion and my expenses and compensation." (Paper 40, Ex. I, Plaintiff Decl. at ¶ 7).

On November 15, 2000, Defendant sent Plaintiff a detailed proposed contract pursuant to which Defendant would become Plaintiff's manager ("the Manager/Boxer Agreement"). Plaintiff refused to sign the proposed agreement, however, and communicated this decision to Defendant in a November 22, 2000, letter written on Plaintiff's behalf by Bill Sorenson.[2] Sorenson's letter rejected the agreement as inconsistent with previous discussions between Plaintiff and Defendant. According to Defendant, the purpose of the agreement was to formalize his conversations with Plaintiff and to spell out additional terms of the 1223 Agreement. Defendant further asserts that payments he made to Plaintiff and his efforts to arrange boxing matches for him were in anticipation of finalizing the Manager/Boxer Agreement and did not constitute performance under the Promoter/Boxer Agreement.

---

[2] There is some inconsistency in the record as to Sorenson's title and role in assisting Plaintiff. Nevertheless, Sorenson assisted Plaintiff in some capacity in negotiations and correspondence with Defendant and Jackson.

On December 9, 2000, Plaintiff "enter[ed] the ring" for his boxing match with Tiozzo, thereby triggering commencement of the Promoter/Boxer Agreement.    Thereafter, Defendant worked to negotiate boxing matches for Plaintiff and met with him at least once to discuss these negotiations.   Defendant also made payments to Plaintiff totaling at least $30,000.[3]  Plaintiff, however, did not fight again until February 23, 2002, in a bout organized pursuant to WBA rules and promoted by another promoter selected in a WBA bid process.   Despite the fact that he was the reigning WBA Cruiserweight champion, Plaintiff "had no income from boxing" between December 10, 2000, and February 23, 2002, and "was forced to borrow money for basic living expenses." (Paper 2, at 2).

On December 8, 2004, Plaintiff filed a complaint against Defendant in the Circuit Court for Prince George's County, Maryland, alleging breach of contract and negligent misrepresentation.[4]  Specifically, Plaintiff's complaint alleged

---

[3] The record is not entirely clear as to the total amount Defendant paid Plaintiff.   It is undisputed that he made a $25,000 payment at the time the 1223 Agreement was executed (Paper 30, Ex. 22, Plaintiff Dep. at 192; Paper 40, Ex. A, Defendant Dep. at 98–99).   Defendant stated in his deposition in a related case that he paid Plaintiff at least $30,000.  (Paper 40, Ex. E, Defendant Dep. at 36).   In his answer to the complaint in this case, however, Defendant claims to have paid Plaintiff "approximately $75,000." (Paper 11, at ¶ 8).

[4] Plaintiff filed a separate action against Jackson in the United States District Court for the District of Columbia. *See Hill v. Jackson*, No. 1:02CV00974 (D.D.C. 2005).   That case was scheduled to go to trial in March 2005, but Jackson failed to
(continued...)

that Defendant's failure to either "set up any boxing matches on Plaintiff's behalf or pay the agreed upon amounts if no bouts were set" constituted a material breach of contract, and that Defendant negligently misrepresented himself as "someone with the ability to promote professional boxers, and promised certain income to Plaintiff." (Paper 2, at 3-4). Defendant removed the case to this court on April 15, 2005, and filed a motion for summary judgment on December 14, 2005, asserting that Plaintiff's claims were barred by the statute of limitations and the statute of frauds. That motion was subsequently denied. (Paper 55). Defendant filed a second summary judgment motion on September 30, 2008. (Paper 100).

**B.    Standard of Review**

It is well-established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see*

───────────────

(...continued)
participate in pretrial proceedings. On April 12, 2005, the court granted default judgment to Plaintiff, awarding him damages of $3,620,000.

*also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must

7

be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### C.   Analysis

Defendant contends that he is entitled to summary judgment on Plaintiff's breach of contract and negligent misrepresentation claims on several grounds. He initially contends that both claims are barred by the doctrine of judicial estoppel. With respect to the breach of contract claim, he maintains that the 1223 Agreement is not a contract, that he is not a party to the Promoter/Boxer Agreement, and that the Promoter/Boxer Agreement is nevertheless void under District of Columbia law. As for the negligent misrepresentation claim, Defendant argues that Plaintiff has failed to identify an actionable misrepresentation of fact, and that the integration clause of the Promoter/Boxer Agreement renders Plaintiff's reliance on any alleged representation unreasonable as a matter of law.

### 1.   Judicial Estoppel

Defendant alleges that Plaintiff has taken positions in this litigation that are inconsistent with positions he took in the prior *Hill v. Jackson* litigation in the United States District Court for the District of Columbia, thus both his breach of contract and negligent misrepresentation claims are barred by the

doctrine of judicial estoppel.  Plaintiff counters that Defendant waived this defense by failing to plead it affirmatively in his answer to the complaint, and that even if Defendant did not waive the defense, he cannot demonstrate the requisite elements of judicial estoppel.

In *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), the Supreme Court of the United States explained the doctrine of judicial estoppel as follows:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

(internal marks and citation omitted).[5]  The purpose of the doctrine is to prevent a party from "'playing fast and loose' with

---

[5] While the quoted language from *New Hampshire* suggests that inconsistent positions must be taken in the context of the same litigation, the Court's ultimate holding was that New Hampshire was judicially estopped from adopting a position in that case that was at odds with a position it took in a 1977 consent decree entered between the same parties.  *See New Hampshire*, 532 U.S. at 746-47.  Moreover, it is not necessary that the prior position be taken in litigation involving the same parties as the subsequent, inconsistent position.  *See, e.g., Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) (plaintiff's position in civil action against police officers under §§ 1983 and 1985 was inconsistent with a position he previously adopted in entering a guilty plea in a criminal case), *cert. denied*, 519 U.S. 1113 (1997).

the courts, and to protect the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3rd Cir. 1953)).  "Its essential function and justification is to prevent the use of 'intentional self-contradiction . . . as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'"  *Allen*, 667 F.2d at 1167 (quoting *Scarano*, 203 F.2d at 513).   Even so, courts must apply the doctrine with caution.  "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 750 (internal marks and citations omitted).

In *Lowery*, 92 F.3d at 224, the United States Court of Appeals for the Fourth Circuit identified three elements that must be met before a court may apply judicial estoppel: (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with one taken in prior litigation; (2) the prior inconsistent position must have been accepted by the court; and (3) the party sought to be estopped must have "intentionally misled the court to gain unfair advantage."  Courts will not apply judicial estoppel where the party's prior position was the result of inadvertence or mistake.

Here, Defendant points to four examples of inconsistencies between the positions Plaintiff took in the prior litigation

against Jackson and those he adopts in this case.   He first observes that, in *Hill v. Jackson*, Plaintiff alleged that "[o]n September 12, 2000, Jackson (individually) and Hill entered into a Promoter/Boxer Agreement whereby Hill granted to Jackson the sole and exclusive right to secure, arrange, and promote all bouts requiring Hill's services as a professional boxer during the term of the Agreement. . . ."  Here, by contrast, Plaintiff argues that "[i]n September 2000, following discussions with Barker and Jackson, Hill signed a written 'Promoter/Boxer Agreement,'" which "provided for Barker and Jackson to be Hill's exclusive promoters." (Paper 100, at 19).   Contrary to Defendant's assertions, Plaintiff's positions on this point are not necessarily inconsistent.   At his deposition in this case, Plaintiff stated several times that he believed Jackson and Defendant were working together as "one entity."  (Paper 100, Ex. 13, Plaintiff Dep. at 26-27).   Therefore, his position in the prior litigation, that Jackson had the exclusive rights to arrange all bouts, was not necessarily inconsistent with his assertion in this case, that as Jackson's partner, Defendant shared the promotion rights with Jackson.   In other words, if Jackson and Defendant were business partners, as Plaintiff alleges, the "exclusive right" held by Jackson might also be held by Defendant.

Defendant further observes that Plaintiff asserted in the *Hill v. Jackson* litigation:

> The agreement was signed by Jeffery
> Jackson in his individual capacity. World's
> Finest Promotions [WFP] had no offices, bank
> accounts, assets or employees. World's Finest
> Promotions did not have a promoter's license.
> Jeffrey Jackson did. Plaintiff therefore
> contends that Jeffrey Jackson is personally
> liable to him for his damages.

(Paper 100, at 19). In this case, however, Plaintiff stated,
"After reasonable inquiry . . . Hill does not possess information
as to the ownership and membership in World's Finest Promotions,
LLC. Upon information and belief, Barker had an interest in the
company, at least as to providing financing." (*Id.*). These
positions are inconsistent. In the prior litigation, Plaintiff
alleged that Jackson signed the agreement in his individual
capacity, whereas his argument here is that Jackson did not sign
the agreement in his individual capacity, but rather that Defendant
was also a party by way of his business relationship with Jackson.
Moreover, while Plaintiff now disavows any knowledge of the
ownership or membership of World's Finest Promotions, a "reasonable
inquiry" into the matter would certainly have revealed that
Plaintiff had such knowledge during the prior litigation.

Defendant also points out that Plaintiff argued in the *Jackson*
case that "[a]t all times relevant, Jeffrey Jackson was the owner
and sole member of World's Finest Promotions," but he now claims to
"not possess information as to the ownership and membership in
World's Finest Promotions, LLC," and that "[u]pon information and

12

belief, Barker had an interest in the company, at least as to providing financing." (Paper 100, at 19). There is no question that these statements are inconsistent. Plaintiff initially contended that Jackson was the sole owner and member of World's Finest Promotions, but now claims to be unable to verify that assertion.

Finally, Defendant observes that Plaintiff argued in the previous litigation, "[a]t all times relevant [World's Finest Promotions] did not have employees." In this case, however, he is "unable to admit or deny" that assertion. (Paper 100, at 19). For the same reasons indicated above, these positions are also inconsistent. Thus, three of the four instances cited by Defendant satisfy the inconsistency element of the judicial estoppel analysis.

The second element is also met, as Plaintiff's prior positions were unquestionably accepted by the district court in *Hill v. Jackson*, where a default judgment was entered in Plaintiff's favor. It is well-established that, upon default, the well-pled allegations in a complaint as to liability are taken as true. *See S.E.C. v. Lawbaugh*, 359 F.Supp.2d 418, 422 (D.Md. 2005) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Inc. v. Mfrs. & Traders Trust Co.*, 137 Fed. Appx. 529, 531 (4th Cir. 2005) (unpublished) (recognizing that a default

judgment can represent acceptance by the court of the prior position in a judicial estoppel analysis). Moreover, unlike collateral estoppel, the doctrine of judicial estoppel does not require that the issue be actually litigated in the prior proceeding. *Lowery*, 92 F.3d at 223 n.3. Thus, the second element of judicial estoppel has also been met here.

Regarding the final element, whether Plaintiff intentionally misled the court to gain an unfair advantage, Defendant argues that Plaintiff cannot claim that his prior position was based on inadvertence or mistake because his claims in both cases arise out of the same set of events. Defendant insists that Plaintiff has engaged in a calculated effort to "game" the system by fabricating inconsistent claims in different cases and different venues. Plaintiff denies this allegation, citing as evidence his voluntary production in this case of all records in the *Hill v. Jackson* litigation.

"Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution." *Lowery*, 92 F.3d at 224. However, Plaintiff should not be allowed to obtain "benefits from two sources based on two incompatible positions, simply because the positions aid [his] claims for remuneration," as such a stance undermines the integrity of the judicial process. *King v. Herbert J. Thomas Memorial Hospital*, 159

14

F.3d 192, 198 (4th Cir. 1998), *cert. denied*, 526 U.S. 1098 (1999).
Here, although Plaintiff has taken some positions in this case that
were accepted by the district court in the prior litigation,
Defendant has not shown that Plaintiff deliberately intended to
mislead this court. Indeed, it is this last factor of the judicial
estoppel analysis that is "determinative" of whether the doctrine
should be imposed. *Lowery*, 92 F.3d at 224. Accordingly, judicial
estoppel will not bar Plaintiff's claims.

    **2. Breach of Contract**

    District of Columbia law governs the contract because of the
choice of law provision in the Promoter/Boxer Agreement. Under
District of Columbia law, a contract is enforceable only if there
is an agreement as to all material terms, and the parties intended
to be bound. *Duffy v. Duffy*, 881 A.2d 630, 633-34 (D.C. 2005).
Material terms include subject matter, price, payment terms,
quantity, and duration. *Affordable Elegance Travel, Inc. v.
Worldspan, L.P.*, 774 A.2d 320, 327 (D.C. 2001). "If all material
terms are addressed, however, and the terms of the contract are
clear enough for the court to determine whether a breach has
occurred and to identify an appropriate remedy, it is enforceable."
*Duffy*, 881 A.2d at 634 (internal marks omitted). Conversely,
"'[i]f the agreement be so vague and indefinite that it is not
possible to collect from it the intention of the parties, it is
void because neither the court nor jury could make a contract for

the parties.'" *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 368, 370 (D.C. 1990) (quoting *Robinson v. Gardiner*, 196 Md. 213, 216 (1950)).

Defendant contends that Plaintiff's breach of contract claim should be dismissed because: (1) the 1223 Agreement is not a contract, (2) Defendant was not a party to the Promoter/Boxer Agreement, and (3) the alleged contract is void under District of Columbia law.

The 1223 Agreement states as follows:

To whom it may concern:

> This letter serves as official authorization that Mr. Cecile D. Barker and Mr. Jeffrey Jackson are hereby authorized to represent me in any and all matters related to my boxing career.

Signed,
/s/ Virgil E. Hill

Accepted and agreed to:
/s/ Cecile D. Barker
/s/ Jeffrey N. Jackson

According to Defendant, the letter does not constitute a contract because it does not contain any material terms and does not impose a mutuality of obligation. Defendant further observes Plaintiff's concession that the actual details of the agreement still had to be "worked out" after the letter was executed. (Paper 100, Ex. 13, Plaintiff Dep. at 142, 145-46). Plaintiff counters that the issue of whether a contract existed between the parties

should be an issue decided by a jury rather than the court.   In addition, he points out that Defendant admitted that the 1223 Agreement produced an obligation on his part to represent Plaintiff as his manager and to promote his boxing career to the best of his ability.  (Paper 100, Ex. 16, Defendant Dep. at 98-99).  Plaintiff also cites the fact that Defendant paid him $25,000 at the time the agreement was executed as evidence of the parties' intent to be bound.

The 1223 Agreement, however, does not include any of the material terms normally associated with a contract.  It purports to give Defendant and Jackson authority to represent Plaintiff in "any and all" aspects of his boxing career, but does not specify the capacity in which Defendant or Jackson would represent Plaintiff or the term of that representation.  Moreover, the fact that Defendant gave Plaintiff a $25,000 check after the letter was executed does not definitively establish that a contract was formed, particularly where the contract is completely silent as to any such obligation.

The District of Columbia Court of Appeals considered a similar case in *Kramer Assoc., Inc. v. Ikam, Ltd.*, 888 A.2d 247 (D.C. 2005).   There, a developer brought a breach of contract claim against an international management consulting firm, alleging that the firm failed to raise capital for a construction project, as it had agreed to do.  During a meeting between the parties, at which a proposed contract was presented but not executed, an agreement

was reached to secure financing for the project and the developer transferred $75,000 to the firm.  Notwithstanding the developer's payment, the appellate court found that no contract had been formed because there was no meeting of the minds.  The court reasoned that the unsigned agreement did not indicate the purpose of the payment; indeed, the developer thought that the payment was "seed money" to be held as a good faith deposit to induce investors, whereas the firm believed the payment was a non-refundable start-up fee to induce the firm to begin work on the project. *Kramer Assoc., Inc.*, 888 A.2d at 252-53.

Similarly, here, there was no meeting of the minds regarding the purpose of the $25,000 payment.  According to Defendant, he gave the check to Plaintiff because Plaintiff advised that he had outstanding expenses and "his children needed to eat." (Paper 100, Ex. 16, Defendant Dep. at 92).  Plaintiff does not provide an explanation as to the purpose of the check, but appears to suggest that it was in connection with Defendant's alleged agreement to serve as Plaintiff's manager and/or promoter.  In the absence of material terms, however, the 1223 Agreement does not constitute a valid and enforceable contract.

The contract truly at issue in this case is the Promoter/Boxer Agreement executed by Plaintiff and Jackson d/b/a World's Finest Promotions.  Defendant claims that he cannot be liable for the alleged breach of this agreement because he was not a party to it.

18

He points out that he did not sign the agreement and was not mentioned in the written instrument.  Plaintiff acknowledges that Defendant did not sign the agreement, but claims that Defendant led negotiations related to the agreement by telephone, orally agreed to its terms, and authorized Jackson to sign it on his behalf. Alternatively, Plaintiff contends, even if Defendant did not authorize Jackson to sign on his behalf, Defendant was still a party to the Promoter/Boxer Agreement because he held himself out as Jackson's partner, leading Plaintiff reasonably to believe that Defendant was a part of World's Finest Promotions.

The relevant language of the Agreement states as follows:

> THIS AGREEMENT [is] made as of this 12th day of September 2000, by and between JEFFREY N. JACKSON, residing at [address omitted], d/b/a "WORLD'S FINEST PROMOTIONS," a Washington, District of Columbia, Limited Liability Company (hereinafter "JACKSON") and VIRGIL EUGENE HILL, residing at [address omitted] (hereinafter "BOXER").

(Paper 100, Ex. 1).  The seven-page contract does not include Defendant's name even once; moreover, it was signed by Jackson and Plaintiff, not by Defendant.  Although Plaintiff contends that Defendant was on the telephone and instructed Jackson to sign on Defendant's behalf, Jackson signed only his own name on the contract.

In the District of Columbia, absent exceptional circumstances, courts "adhere to an 'objective law' of contracts, which means that the written language will govern the parties' rights, unless it is

not susceptible of clear meaning. . . ." *Sagalyn v. Found. for Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997). "Words [are] given their ordinary and usual meaning." *Id.* A contract is deemed ambiguous only when the provisions in controversy are reasonably susceptible to more than one meaning. *Washington Properties, Inc. v. Chin, Inc.*, 760 A.2d 546 (D.C. 2000). Here, the contract states that there are only two parties: Plaintiff and Jackson d/b/a World's Finest Promotions. In addition, the agreement provides that Jackson has the "sole and exclusive right" to secure, arrange, and promote all bouts requiring Plaintiff's services as a boxer. (Paper 100, Ex. 1). Thus, the plain language of the contract clearly reflects that only Plaintiff and Jackson were intended to be bound by its terms.

Plaintiff contends that he believed Defendant gave Jackson the apparent authority to execute the contract on his behalf, and that it was reasonable for him to believe that Defendant was a party because he solely negotiated the terms of the Promoter/Boxer Agreement. Apparent authority arises when a "principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold." *Dorsky Hodgson & Partners, Inc. v. Nat'l Council of Sr. Citizens*, 766 A.2d 54, 56 (D.C. 2001). Apparent authority can be shown through written or spoken words. *Miller v. Holzmann*, 563 F.Supp.2d 54, 122 (D.D.C. 2008). The party

asserting apparent authority has the burden of proof on that issue. *Mgmt. P'ship, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C. 1980).

Here, viewing the facts in the light most favorable to Plaintiff, the non-movant, Defendant's words could have given Plaintiff the impression that Jackson was executing the contract on behalf of Defendant. According to Plaintiff, Defendant was the one who discussed the terms of the contract with Plaintiff over the telephone and allegedly "guaranteed" the agreement. (Paper 100, Ex. 13, Plaintiff Dep., at 152, 202). Plaintiff claims that Defendant "hammer[ed] out" the details with him, and that Jackson said little during the negotiations. (*Id.* at 202). Plaintiff insists that he was led to believe that Jackson was merely a "front" for Defendant (*Id.* at 203), a claim that was substantially corroborated by Cedric Kusner, a well-known boxing promoter, who stated in his deposition that he considered Defendant and Jackson to be "one and the same." (Paper 102, Ex. B, Kusner Dep. at 97). Thus, Plaintiff has set forth sufficient facts supporting a theory that Defendant orally agreed to the terms of the Promoter/Boxer Agreement by telephone. The doctrine of partial performance estoppel, moreover, may preclude reliance on the statute of frauds.

Defendant also contends that Plaintiff's breach of contract claim must fail because the Promoter/Boxer Agreement violates District of Columbia law. Specifically, he points to two sections in the District of Columbia Municipal Regulations ("DCMR").

21

Section 2103.1 in Title 19 of the DCMR provides that "[n]o person shall promote a professional event in the District without having first entered into a valid written contract, conforming to the requirement of this chapter, with each contestant or manager." Pursuant to 19 DCMR § 2103.5, "[n]o contract shall provide for, contemplate, or be conditioned upon the performance by a contestant of services other than participating in one contest."  Defendant argues that Plaintiff's contract claim is predicated on an alleged oral agreement, which is prohibited by § 2103.1.  Moreover, he asserts, Plaintiff's contention that Defendant was contractually obligated to promote nine boxing matches under the Promoter/Boxer Agreement violates § 2103.5, which limits promotional agreements to "one contest."

Plaintiff counters that § 2103.1 applies only to professional events "in the District," and therefore is inapplicable to boxing matches occurring outside of Washington, D.C.  He additionally argues that the regulations cited by Defendant contemplate "single bouts in which there is a contract or contract between a bout promoter and both boxers, and the promoter is promoting the bout, not an individual boxer." (Paper 102, at 13).  Here, by contrast, the Promoter/Boxer Agreement is for the promotion of the boxer rather than the promotion of the event.

Section 2103.1 plainly states that it applies to bouts held in the District of Columbia only, and the agreement does not limit the

bouts to a geographical area.  The language in § 2103.5, however, is more problematic.  That statute suggests that all contracts are limited to a boxer's participation in one contest.  It appears that the "one contest" limitation, however, applies only to bouts held in the District of Columbia, as set forth in § 2103.1.  Neither party cites to relevant cases in support of their respective arguments.  Because the applicability of § 2103.5 to this case is unclear, the court declines at this time to find the contract void under District of Columbia law.  Therefore, Defendant's motion for summary judgment will be denied with respect to Plaintiff's breach of contract claim arising from the Promoter/Boxer Agreement.

### 3.  Negligent Misrepresentation

To establish a claim of negligent misrepresentation under District of Columbia law, Plaintiff must show that: (1) Defendant made a false statement or omission of fact, (2) the statement was in violation of a duty to exercise reasonable care, (3) the false statement or omission involved a material issue, (4) Plaintiff relied to his detriment on the false information, and (5) Defendant's conduct was the proximate cause of Plaintiff's injury. *Bell ex rel. Albert R. Bell Living Trust v. Rotwein*, 535 F.Supp.2d 137, 144 (D.D.C. 2008).  In determining whether an alleged misrepresentation was material, the court must consider whether "a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the

23

transaction in question" or whether "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *C & E Services, Inc. v. Ashland, Inc.*, 498 F.Supp.2d 242, 258 (D.D.C. 2007).

Defendant insists that he is entitled to summary judgment on Plaintiff's negligent misrepresentation claim because Plaintiff fails to identify an actionable misrepresentation of fact, and because the integration clause in the agreement renders his reliance on any alleged representation unreasonable as a matter of law.

Plaintiff alleges that Defendant made two false representations: (1) that Defendant was in the boxing business and had the experience and ability to promote professional boxers, such as Plaintiff, and (2) that Defendant promised "certain income" to Plaintiff, which Plaintiff never received. Defendant counters that the first statement is not actionable because any such representation made by Defendant as to his promotional experience and qualifications was mere puffery. According to Defendant, this claim relates to Plaintiff's subjective opinion and is incapable of being proven.

Puffery refers to the expression of an exaggerated opinion, as opposed to a factual misrepresentation, with the intent to sell a

good or service.  Black's Law Dictionary 1269 (8th ed. 2004); *see also Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009) ("The term *puffery* is used to characterize those vague generalities that no reasonable person would rely on as assertions of particular facts").  According to Plaintiff, Defendant represented that he had experience working with professional boxers, such as the well-known pugilist Riddick Bowe, and had connections to organize promotions for boxing matches.  (Paper 102, Ex. A, Plaintiff Decl. at ¶ 21).  Under these alleged facts, Defendant's contention that he was experienced in the boxing business and that he had worked with a renowned boxer was not a subjective opinion or a vague assertion, but a statement of fact.

Plaintiff also argues that Defendant made false representations in promising him payments of $25,000 if Plaintiff signed the 1223 Agreement, payments of $20,000 if Plaintiff signed the Promoter/Boxer Agreement, and other payments through Jackson. Defendant correctly observes that these promises cannot support a claim of negligent misrepresentation as a matter of law because a breach of future promises "lies in the realm of contract."  *See One-O-One-Enterprises, Inc. v. Caruso*, 668 F.Supp. 693, 699 (D.D.C. 1987), *aff'd*, 848 F.2d 1283 (D.C. Cir. 1988).  An action for negligent misrepresentation can only be predicated on misrepresentations of past or existing fact; however, Plaintiff can still establish that Defendant made a false representation when he

asserted that he had the experience and ability to promote bouts and had previously worked with Riddick Bowe.  Thus, Plaintiff has identified an actionable misrepresentation of fact.

Defendant further argues that Plaintiff's reliance on Defendant's alleged misrepresentation was not reasonable because the integration clause in the Promoter/Boxer Agreement included Plaintiff's express representation that he had no prior or contemporaneous "contract, agreement, or understanding, whether oral or written," relating to boxing promotion with anyone other than Jackson.  (Paper 100, Ex. 1 at ¶ 9(a)).  Moreover, Defendant observes, the agreement expressly provides that it "supersedes any and all prior or contemporaneous written or oral agreements or representations."  (Paper 100, Ex. 1 at ¶ 17).  According to Defendant, it was not reasonable for Plaintiff to rely on Defendant's assertions that he had significant experience in the boxing industry and could arrange bouts for Plaintiff because the integration clause superseded any prior promises Defendant made to Plaintiff.  Plaintiff argues that Defendant misses the point of his negligent misrepresentation claim, as it is an alternative theory of liability not based on the specific terms of the agreement. Therefore, Plaintiff contends, Defendant's invocation of the language of the agreement is not relevant to this claim.

With regard to the only actionable alleged misrepresentation, those relating to Defendant's credentials, Plaintiff is correct.

26

Essentially, Plaintiff contends that he reasonably relied to his detriment on Defendant's assertions concerning his own credentials in entering into the promotion agreement. Nothing in the agreement itself contradicts those assertions.

Ordinarily, "[t]he reasonableness of the reliance upon a misrepresentation is a question of fact, for which disposition by summary judgment is generally inappropriate." *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987). In addition, although "reducing an agreement to 'a writing which in view of its completeness and specificity reasonably appears to be a complete agreement' creates a presumption that the agreement is integrated, the ultimate determination of integration is 'a question of fact to be determined in accordance with all relevant evidence,' not on the basis of the text of the agreement alone." *Bowden v. United States*, 106 F.3d 433, 439-40 (D.C. Cir. 1997) (quoting Restatement (Second) of Contracts § 209(3) cmt. c); *see also Howard Univ. v. Good Food Servs.*, 608 A.2d 116, 127 (D.C. 1992) (explaining that an integration clause is not a conclusive factor in ascertaining the parties' intent).

Here, notwithstanding the integration clause, there is at least some evidence that Plaintiff reasonably relied on Defendant's assertions regarding his experience in the boxing industry. According to Plaintiff, Defendant told him he had experience working with Riddick Bowe, a professional boxer. (Paper 100, Ex.

13, Plaintiff Dep. at 129-30).   Indeed, according to Plaintiff, Defendant said he was specifically working to "promote" Bowe and arrange boxing matches on Bowe's behalf.   (Paper 102, Ex. A, Plaintiff Decl. at ¶ 21).   In his deposition, Plaintiff asserted that Defendant said he took Bowe to the best doctors and attorneys in order to bring Bowe "back" as a professional boxer (Paper 100, Ex. 13, Plaintiff Dep. at 129-30), and that he could do for Plaintiff "exactly what [he] did for Riddick Bowe." (*Id*. at 130). Therefore, Defendant's motion for summary judgment will be denied with respect to a portion of the negligent misrepresentation claim.

### 4.   Damages Other than Lost Profits and Loan Interest

Defendant further contends that he is entitled to summary judgment with respect to Plaintiff's various claims for damages, including lost profits, loan interest, promotional income, real estate losses, and expenses related to trainers, coaches, and advisors.   Defendant's arguments related to Plaintiff's lost profits and loan interest claims will be addressed later in this opinion.   His arguments with respect to other claimed damages, however, will be addressed here.

In his amended interrogatory responses, Plaintiff asserts his intent to seek lost promotional income in the amount of $10,000 per bout.   (Paper 100, Ex. 3, at 4).   According to Plaintiff, this promotional activity would have included public appearances and his wearing of certain apparel or participation in advertising in

28

connection with each of the bouts Defendant was allegedly responsible for arranging.  Defendant maintains that Plaintiff's claim for lost promotional income must fail because it was never a part of the alleged agreement with Defendant.  Defendant further asserts that Plaintiff fails to demonstrate how he calculated the amounts he claims are owed, and observes that Plaintiff admitted receiving at least $[REDACTED] in such income in connection with a November 2002 bout.  (Paper 100, Ex. 12 at 4).

Plaintiff has provided no basis for how he came up with the $10,000 per bout figure.  Because his claim is based on no more than conjecture, Defendant's motion will be granted with respect to this damages claim.

Plaintiff further alleges that because of Defendant's failure to arrange any bouts, the mortgages on three of his homes – located in Missouri, California, and New Jersey – went into arrears. (Paper 100, Ex. 3 at 9).  Plaintiff contends that he was forced to sell his home in California to Denean Hill, his ex-wife, for $230,000, the balance on the mortgage at that time, even though the value of the home was $475,000.  Additionally, he contends that he was forced to sell his New Jersey home to prevent foreclosure, and that he lost the Missouri home in which he intended to reside after his retirement from boxing.

Defendant maintains that these alleged real estate losses should be discarded because Plaintiff provides an accounting of his

alleged losses only with respect to the home in California, not for the other two.  Furthermore, Defendant asserts, the deed Plaintiff provided as proof of the sale of the California home shows that it was a "gift" transfer and that Plaintiff remains a joint owner of the property.  (Paper 100, Ex. 10).

Like his claim for damages resulting from lost promotional income, Plaintiff has not provided sufficient evidence to establish his alleged real estate losses.  Indeed, Plaintiff has provided no evidence regarding the value of his homes in New Jersey and Missouri.  In addition, he offers no basis for his contention that he suffered a "loss of half of the value" of the California home. (Paper 102, at 21).  Therefore, Defendant's motion will be granted with respect to Plaintiff's real estate damages claim.

In his answers to interrogatories, Plaintiff additionally claims damages for money owed to several trainers, coaches and advisors that he hired in anticipation of the bouts he believed Defendant was arranging.  (Paper 100, Ex. 3, at 9-10). Specifically, Plaintiff claims the following debts: (1) $10,000 to Allen Larsien, trainer, (2) $10,000 to John Simon, trainer, and (3) $40,000 to Michael Hall, trainer.  In addition, he claims to owe Bill Sorenson $68,000 for a 2001 loan, $47,600 from Plaintiff's purses in 2001, and ten percent of what Plaintiff should have made in 2001 for Sorenson's work during that year as Plaintiff's advisor.  Defendant argues that the Promoter/Boxer Agreement

provides that any training expenses were Plaintiff's responsibility and should have been paid out of Plaintiff's purses and/or his pocket.

The relevant language in the Promoter/Boxer Agreement provides that "JACKSON hereby agrees to pay, *as an advance*, up to a maximum of $25,000 of all training expenses incurred by BOXER for each fight"; that if such expenses exceeded that amount, "BOXER hereby agrees to pay the excess himself"; and that "*[a]ll training advances will be deducted from the final payment due to BOXER for any Bout*, under the terms of this Agreement." (Paper 100, Ex. 1 at ¶ 5(d)) (emphasis added). The agreement further establishes varying amounts Plaintiff would receive for the bouts promoted, subject to certain conditions. For each of these amounts, the agreement expressly provides that all payments due to Plaintiff would be "inclusive of training expenses." (*Id*. at ¶ 5). Thus, Plaintiff is not entitled to sums for training expenses over and above his alleged lost profits. Insofar as Plaintiff claims damages related to his hiring of an "advisor" or for repayment of a debt to the advisor, assuming such debts fall outside the realm of "training expenses," the agreement contains no provision that would obligate Defendant to advance or pay such debts if Defendant were found to be a party to the Promoter/Boxer Agreement. Accordingly, Defendant's motion will be granted with respect to this damages claim.

31

In sum, Defendant's motion for summary judgment with respect to Plaintiff's claim for damages for (1) loss of promotional income, (2) real estate losses, and (3) training expenses will be granted.

## II.  Plaintiff's Lost Profits and Related Damages Claims

### A.  Background

The facts pertinent to Defendant's motion to dismiss Plaintiff's lost profits claim (Paper 98) are extensive, and the parties go into great detail as to various alleged discrepancies in Plaintiff's financial records.  Because of the sheer volume of facts presented, only the most relevant are discussed here.

By November 2006, the parties had completed discovery with the exception of Defendant's discovery of Plaintiff's tax returns and other financial records supporting Plaintiff's lost profits claim. In a March 27, 2007, Order, Magistrate Judge William Connelly, to whom the case was referred for discovery, granted Defendant's motion to compel Plaintiff to provide these documents by April 10, 2007.  Plaintiff did not respond to the motion to compel, prompting Defendant to file a motion for sanctions against Plaintiff on November 2, 2007.  Defendant argued that sanctions were appropriate given Plaintiff's failure to comply with order compelling the production of these documents, his failure to comply with the scheduling order, and his lack of candor regarding the existence of documents relating to his alleged lost profits.  Judge Connelly

partly granted the motion for sanctions, finding Plaintiff's lack of candor regarding the existence or non-existence of tax returns "troubling," and reasoning that Plaintiff should have been able to state affirmatively whether or not he had filed personal tax returns for the years 2002 and 2003, as well as tax returns for his business, Quicksilver Hill, LLC ("Quicksilver"), for the same years. (Paper 85). Judge Connelly observed that Defendant had waited over a year for the production of Plaintiff's income tax returns, and found that the delay was solely due to Plaintiff's inaction. Given Plaintiff's lack of candor, the court precluded Plaintiff from offering any documents produced after April 10, 2007, as well as any evidence that might be produced after the September 28, 2007, supplementation deadline. The court found that the other requested sanctions, including the requested dismissal of Plaintiff's lost profits claim, were unnecessary in light of the preclusion sanction.

### 1.   Production of Plaintiff's Tax Returns

After the court's order, Plaintiff continued to delay the production of his tax returns. In a joint status report filed on January 31, 2008, Plaintiff informed the court that he would produce copies of the final tax returns filed with the Internal Revenue Service ("IRS") to Defendant by February 18, 2008, but failed to do so. (Paper 92). However, Plaintiff did provide summaries of financial information that Plaintiff and his wife,

33

Carla Hill, prepared for the years 2002 to 2006, as well as copies of various receipts and invoices for the years 2002, 2004, 2005, and 2006.  Plaintiff included only two documents regarding his 2002 expenses and no documents regarding his expenses in 2003. Plaintiff's counsel explained that the absence of these documents was due to a flood in Plaintiff's basement that destroyed several of the documents.  (Paper 98, Ex. 8).   Additionally, in a joint status report filed on March 21, 2008, Plaintiff explained that there were "unexpected delays [in] determining the amount of foreign taxes" Plaintiff paid in 2002.  (Paper 94 at ¶ 2).

On March 17, 2008, Plaintiff provided his tax returns for the years 2002 to 2006.  Defendant expressed concern with the accuracy of the returns themselves and with the fact that they were unsigned and produced without any proof of filing.  Based on these concerns, Defendant demanded that Plaintiff execute IRS Form 4506, directing the IRS to produce to Defendant certified copies of any tax returns that Plaintiff filed for the years 2002 to 2006.  The IRS responded to the request in July 2008, reporting that it could locate only the 2005 and 2006 returns, and none for 2002, 2003, or 2004.

In addition, the 2006 tax returns that the IRS produced to Defendant were different from the ones Plaintiff provided to Defendant; the 2006 tax return actually filed with the IRS reported lower net profits than the version Plaintiff provided to Defendant. Plaintiff contends that the discrepancy in the returns was the

34

result of a legitimate mistake.  He points out that when Robert Becker, his accountant, produced final returns for the 2002 to 2006 tax years to Defendant, he mistakenly produced an earlier version of the 2006 tax return dated March 1, 2008.  (Paper 103, Ex. 4, Becker Decl.).  After Mr. Becker prepared the March 1, 2008, tax return, he made changes based on additional information provided by Plaintiff and his wife, namely a change in income.  Mr. Becker then provided the final returns to the IRS with the changes reflected on March 11, 2008.  Mr. Becker has since submitted a declaration confirming that he made a mistake by not providing to Defendant the final version of Plaintiff's 2006 tax returns.  (Paper 103, Ex. 4, Becker Decl.).

### 2.    Depositions of Plaintiff and Robert Becker

On June 25, 2008, Defendant took the depositions of Plaintiff and Mr. Becker, Plaintiff's accountant.  Mr. Becker stated that he relied on Plaintiff's word that the financial information provided to him was correct and acknowledged that he would have no way of knowing whether Plaintiff received unreported income, such as cash compensation, unless Plaintiff told him.  Mr. Becker relied at least in part on Plaintiff's tax summaries to prepare the tax returns. (Paper 98, Ex. 7, Plaintiff's Tax Summaries).

During his deposition, Plaintiff had difficulty recalling whether he had earned any income from a promotional and sponsorship agreement that he had previously identified in the *Hill v. Jackson*

litigation.    For  example,  Plaintiff  could  not  recall  earning
$50,000 from a sponsorship agreement with Skydancer Casino in 2002.
(Paper  98,  Ex.  22,  Plaintiff  Dep.  at  75-76).    In  the  previous
action against Jackson, however, Plaintiff admitted receiving this
money.   (Paper 98, Ex. 19 at 4).   Plaintiff attested that because
his wife handled his finances, he was unfamiliar with the details
of these records.

### 3.  Disputes Regarding Unreported Income

### a. [REDACTED] in Alleged Unreported Income

Defendant  served  subpoenas  on  South  Jersey  Federal  Credit
Union  and  Bank  of  America  seeking  the  production  of  Plaintiff's
account  statements.      According  to  Defendant,  the  statements
revealed substantial transfers of money into a bank account jointly
owned by Plaintiff and his wife from another account at the same
bank.   The statements further revealed that during the 2006 tax
year, for which Plaintiff claimed a total of [REDACTED] in gross
income on Schedule C, Carla Hill's account received incoming wire
transfers totaling more than [REDACTED].   At her deposition, Ms.
Hill asserted that this was not her income; she claimed that the
Hills' only source of income from 2002 to 2006 was Plaintiff's
boxing-related activities.   (Paper 98, Ex. 23, Carla Hill Dep. at
44-45).

Plaintiff contends that the [REDACTED] constituted advances
provided to Plaintiff in 2006 for a 2007 boxing match in Germany.

36

Mr. Becker, Plaintiff's accountant, has submitted a declaration stating that, under accounting principles, these monies would not be accounted for until they were earned, the year the fight actually took place. (Paper 103, Ex. 4, Becker Decl. at ¶ 4).

### b. The Hugh Sibley "Loan"

Defendant contends that Plaintiff's tax returns failed to disclose that Plaintiff received more than $105,000 in income in the form of debt forgiveness in 2003. In his interrogatory responses in the *Hill v. Jackson* litigation, Plaintiff stated that he had received $150,000 from a man named Hugh Sibley. (Paper 98, Ex. 19 at 2). In return, Plaintiff was obligated to repay Mr. Sibley with ten percent of the proceeds from his next four fights. Of the total amount due, Plaintiff repaid Mr. Sibley approximately $45,000, leaving a balance of $105,000.

Plaintiff counters that he entered into an agreement with Mr. Sibley whereby Mr. Sibley gave him $50,000, rather than $150,000; that the money was not a loan, but a business investment on Sibley's part; and that there was no requirement that Plaintiff pay it back in full.

### c. Quicksilver Hill, LLC

The last major dispute among the parties is over the income paid to Quicksilver, Plaintiff's limited liability company. As previously noted, Defendant requested tax returns and financial information for Quicksilver. In response, Plaintiff said he could

not recall whether Quicksilver had a bank account or any business operations. (Paper 98, Ex. 22, Plaintiff Dep. at 32). Plaintiff also stated that although Quicksilver was his limited liability company, he did not run it and had very little to do with its daily operations. (*Id.*). According to Defendant, contrary to Plaintiff's claims, bank records reflect that a substantial amount of Plaintiff's income was deposited into a Bank of America account in Quicksilver's name. The Quicksilver account received wire transfers totaling [REDACTED] in connection with a "[REDACTED]" around the time of a November 2002 boxing Match between Plaintiff and Joey DeGrandis. (Paper 98, Ex. 15, at BA 458, 11/19/2002 – $25,000); (*Id.*, at BA 459, 11/26/2002 – $28,000); *Id.*, at BA 463, 12/24/2002 – $1,000). This income was not reported on the March 17, 2008, tax returns given to Defendant.

Plaintiff states that he was never aware of any monies being paid to Quicksilver and, moreover, that the documents produced by Bank of America indicate that the account is in the name of Plaintiff as well as Cary Redlin, Plaintiff's personal assistant, not in the name of the company. (Paper 102, Ex. A., Plaintiff Decl. at 1). Plaintiff insists that he was not aware that Redlin had put his name on the account. (*Id.*).

**B.  Analysis**

Defendant argues that Plaintiff's claim for lost profits is barred under (1) the clean hands doctrine, (2) Federal Rule of

Civil Procedure 41(b), (3) Federal Rule of Civil Procedure 37(b), and (4) as an exercise of the court's discretion. Defendant also contends that Plaintiff is not entitled to loan interest damages. In his motion for summary judgment, Defendant argues that Plaintiff's lost profits claim should be dismissed because the damages cannot be determined with reasonable certainty.

### 1. Clean Hands Doctrine

The Supreme Court has long recognized "the equitable maxim that he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (internal quotation marks omitted). The purpose of the maxim is not to protect the parties, but rather to safeguard the judicial process. *Mas v. Coca-Cola Co.*, 163 F.2d 505, 507-08 (4th Cir. 1947). The doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.*, 324 U.S. at 814. Although the doctrine "does not demand that its suitors shall have led blameless lives . . . it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814-15 (internal marks and citation omitted). An unclean hands defense requires that the defendant show that he was injured by the plaintiff's conduct. *See Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978); *JTH Tax, Inc. v. H&R*

*Block E. Tax Servs., Inc.*, 128 F.Supp.2d 926, 949 (E.D.Va. 2001), *vacated in part on other grounds*, 28 Fed.Appx. 207 (4th Cir. 2002).

Defendant argues that Plaintiff has unclean hands because (1) he implied in his deposition that he had filed income tax returns for five years, when he had not; (2) he made false representations regarding his income in sworn interrogatory responses; and (3) he produced false income tax returns in response to document requests. In addition, Defendant observes, Plaintiff produced false income tax returns both before and after the court sanctioned him for his lack of candor regarding these returns. Defendant contends that Plaintiff gave him a false 2006 tax return a mere four days after filing the actual version with the IRS.

According to Defendant, Plaintiff's actions justify dismissal of his lost profits claim, as the court did in *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103 (D.Md. 1989). *Smith* involved a plaintiff who was piloting a single engine aircraft when the plane crashed, causing him to suffer injuries. The plaintiff subsequently sued the airplane manufacturer, inspector, and repairman for negligence and breach of warranty. The plaintiff sought compensatory damages from all the defendants and punitive damages from the manufacturer. During the course of discovery, the plaintiff deliberately gave false answers to interrogatories and deposition questions regarding his prior income, and later admitted his lies. The court dismissed the plaintiff's lost profits damages

claim, finding that he had abused the discovery process and deprived the defendants of essential information. In so doing, the court reasoned that the plaintiff's tax returns were "critical to allowing the defendants to assess accurately their potential liability for these damages." *Smith,* 124 F.R.D. at 107.

Plaintiff argues that *Smith* is distinguishable from this case because there is no evidence that he intentionally provided false information. Plaintiff maintains that he not only produced information for the tax years requested, 2002 and 2003, but all tax information through 2006. He further argues that when he affirmed at his deposition that he had filed tax returns, he did not realize that Defendant's attorney was referring to post-2002 taxes or any years in particular. (Paper 102, Ex. A., Plaintiff Decl. at ¶ 7). Plaintiff further states that because his income and expenses were managed by his former assistant and accounting company, he did not know that tax returns for 2002 and 2003 had never been prepared on his behalf. (*Id.* at ¶ 1). He insists that he never knowingly submitted false tax returns for 2006, and points out that his accountant, Mr. Becker, submitted a declaration clarifying that he had inadvertently failed to provide Defendant with the final version of Plaintiff's 2006 tax returns. (Paper 103, Ex. 4, Becker Decl. at ¶ 3).

Plaintiff asserts that he never underreported income from his boxing matches and attempts to correct alleged misconceptions in

41

this regard.   For instance, he references a [REDACTED] payment
Defendant claims that Plaintiff received from Don King Productions,
but contends that he received only [REDACTED], which is the amount
he reported.   (Paper 102, Ex. A, Plaintiff Decl. at ¶ 5).
Plaintiff also addresses an alleged inconsistency between his
answers to interrogatories, where he reported earning [REDACTED] of
income from a 2003 fight with Donnie Lalone, and his 2003 return,
where he reported earning only [REDACTED] from the fight.   In his
declaration, Plaintiff states that the discrepancy was due to a
typographical error and that the amount he actually received from
the fight was the amount he reported,[REDACTED].   (Paper 102, Ex.
A., Plaintiff Decl. at ¶ 9).

The court declines to preclude Plaintiff's lost profits claim
under the unclean hands doctrine.   Unlike the circumstances in
*Smith*, the case upon which Defendant relies, there is much less
indication here that Plaintiff intentionally provided false
testimony or false financial records.   In *Smith*, the plaintiff
admitted that the tax documents he provided were false and admitted
lying in his deposition and answers to interrogatories.   Here, by
contrast, Defendant has not shown that Plaintiff intentionally
falsified testimony and Plaintiff denies having done so.
Furthermore, Plaintiff has submitted a declaration explaining the
reasons behind many of the discrepancies in income that Defendant
highlighted in his motion.   (Paper 102, Ex. A., Plaintiff Decl.).

Defendant will have every opportunity to attack Plaintiff's credibility at trial, but Plaintiff's lost profits claim will not be dismissed pursuant to the clean hands doctrine.

## 2. Federal Rule of Civil Procedure 41(b)

As an alternative ground, Defendant contends that Plaintiff's lost profits claim should be dismissed pursuant to Fed.R.Civ.P. 41(b). The rule provides, in pertinent part:

> If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.

Because dismissal is a severe sanction, the Fourth Circuit has established four criteria that must be considered when Rule 41(b) is invoked:

> (1) the degree of personal responsibility on the part of the plaintiff; (2) the amount of prejudice to the defendant caused by the delay; (3) the presence or absence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal

*Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978).

Defendant insists that Plaintiff is solely responsible for his false deposition testimony, interrogatory responses, and document productions. He maintains that Plaintiff testified falsely in his October 2005 deposition by implying that he had filed income tax returns when in fact he knew he had not; that he executed sworn amended interrogatory responses in April 2006, omitting hundreds of

thousands of dollars of income from fight purses, advances, and forgiveness loans; and that Plaintiff caused his counsel to provide purportedly "final" 2006 tax returns to Defendant when Plaintiff knew those returns were not the final version.

Plaintiff denies that he testified falsely or that he knowingly provided false interrogatory responses, but acknowledges that he has kept incomplete records. He further states that he did not evade deposition questions; rather, he genuinely did not know whether he had filed income tax returns because he was not involved in preparing those records. (Paper 102, Ex. A, Plaintiff Decl. at ¶ 1). Plaintiff explains that, at the time of his deposition, he sincerely believed tax returns for 2002 and 2003 had been prepared on his behalf. (*Id.*). Plaintiff also points out that his accountant has submitted a declaration acknowledging that he made a mistake in providing the non-final version of Plaintiff's 2006 tax returns to Defendant. (Paper 103, Ex. 4, Becker Decl. at ¶ 3).

Defendant asserts that Plaintiff's lack of candor regarding his actual income and net profits has prejudiced his ability to assess his risk of liability and to mount a defense to Plaintiff's lost profits claim. Defendant argues that Plaintiff's subsequent production of tax returns has failed to cure this prejudice because the returns are demonstrably false and Plaintiff has not produced documentation establishing his actual income and expenses for the relevant years.

Plaintiff responds that he has abided by all deadlines pursuant to the court's scheduling order. He points out that Defendant now has over one thousand pages of document production, written discovery, and deposition testimony. Defendant counters that only a few of these pages relate to Plaintiff's financial records for the years 2002 and 2003.

According to Defendant, Plaintiff's history of dilatory conduct is well-established, as evidenced by the court's decision to sanction Plaintiff for his delay in producing his tax returns. Judge Connelly determined that Plaintiff had caused discovery to "drag far too long," thereby "wasting the Court's and Defendant's time." (Paper 85, at 5). Plaintiff contends that there have been no additional delays regarding the deadlines set out in the court's scheduling order.

Finally, Defendant points out that he is not requesting a complete dismissal of Plaintiff's complaint under Fed.R.Civ.P. 41(b), but rather a dismissal of only Plaintiff's lost profits claim. Dismissal of this damages claim is appropriate, Defendant argues, because lesser sanctions, such as the one imposed by Judge Connelley, have failed to deter Plaintiff's misconduct.

Plaintiff counters that Defendant's request to dismiss his lost profits claim threatens to decimate his case. He argues that Defendant's request is not particularly tailored to the alleged wrongdoing and that Defendant has no evidence that Plaintiff

deliberately falsified testimony or provided false records.   In addition, as previously explained, Plaintiff states that the submission of the "non-final" 2006 tax returns to Defendant was due to a mistake on the part of Plaintiff's accountant, not that of Plaintiff himself.  (Paper 102, Ex. A., Plaintiff Decl. at ¶ 14; Paper 103, Ex. 4, Becker Decl.).

It is undisputed that Defendant has suffered prejudice by having to wait a significant amount of time for Plaintiff's records, only to then receive incomplete information.  The court is not convinced, however, that the other elements required before Fed.R.Civ.P. 41(b) may be invoked are met here.  Plaintiff credibly believed that his accountant had filed the tax returns at issue, and when he answered, "yes, probably," when asked if he had filed the returns, this accurately reflected his knowledge at the time of his deposition.   Moreover, Plaintiff states that he was not responsible for managing his finances, but instead allocated that duty to his personal assistant and accounting company (Paper 102, Ex. A, Plaintiff Decl. at ¶ 1); thus, it is reasonable to believe that he would not know about certain financial matters.   In addition, at least one mistake regarding the submission of the "non-final" version of Plaintiff's 2006 tax returns was attributable to Plaintiff's accountant, not Plaintiff.

Because dismissing a claim under Fed.R.Civ.P. 41(b) is an extreme sanction, it must be used sparingly and only in the most

egregious of instances.  *Smith*, 124 F.R.D. at 109.  The court concludes that dismissal of Plaintiff's lost profits claim under Rule 41(b) is not appropriate at this time.

**3.  Federal Rule of Civil Procedure 37(b)**

Defendant also asserts that Plaintiff's lost profits claim should be dismissed under Fed.R.Civ.P. 37(b).  That rule provides, in pertinent part:

> If a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.  They may include the following:
>
> > (i)  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> >
> > (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> >
> > (iii) striking pleadings in whole or in part;
> >
> > (iv) staying further proceedings until the order is obeyed;
> >
> > (v)  dismissing the action or proceeding in whole or in part;
> >
> > (vi) rendering a default judgment against the disobedient party; or

47

> (vii) treating as contempt of court
> the failure to obey any order except
> an order to submit to a physical or
> mental examination.

Fed.R.Civ.P 37(b)(2)(A).

Prior to imposing the sanction of dismissal under this rule, the district court must consider four factors: (1) whether the noncomplying party acted in bad faith, (2) the degree of prejudice suffered by the other party or parties as a result of the failure to comply, (3) the deterrence value of dismissal as a sanction for noncompliance, and (4) the efficacy of a less drastic sanction. *Mutual Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).  The court must additionally give the noncomplying party an "explicit and clear" warning of the consequences of failing to satisfy the court's conditions and orders.  *Choice Hotels Int'l, Inc. v. Goodwin & Boone*, 11 F.3d 469, 471 (4th Cir. 1993); *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 954 n.2 (4th Cir. 1987) (stating that a warning was a "salient fact" that distinguished cases in which default judgment was appropriate sanction for discovery abuse under Rule 37).  "[T]he imposition of sanctions under Rule 37(b) lies within the trial court's discretion." *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995).

The second and fourth factors have already been discussed in the previous section.  With respect to the first factor, Defendant

does not explain why he believes Plaintiff's actions were taken in bad faith, but simply refers the court to his arguments in the previous section.[6]  Plaintiff counters that the analysis under Rule 37(b) is different than under Rule 41(b) because only the former requires evidence that the party acted in bad faith.  He insists that he has not done so here.

With respect to the third factor, Defendant argues that there is a compelling need to deter the kind of discovery misconduct in which Plaintiff has allegedly engaged.  He contends that the judicial process and the public's confidence in that process as a means of resolving disputes relies on the candor of civil litigants and the complete disclosure of information regarding their claims. Moreover, according to Defendant, Plaintiff's deception and delay has forced him to spend considerable time and resources uncovering the truth.

Plaintiff asserts that Defendant has not shown that he lied or tried to conceal information.  He states that his wife, Carla Hill, did her best to recreate five years of financial information for

---

[6]  Defendant addresses the manner in which Plaintiff allegedly acted in bad faith for the first time in his reply papers.  (Paper 108).  The general rule in federal courts is that an argument raised for the time in a reply brief or memorandum will not be considered.  *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006); *see also United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006).  The rule stems from a concern that arguments raised for the first time in a reply brief would prejudice the opposing party, which would not have an opportunity to respond.

purposes of this case, and while she may have made mistakes, there was no deliberate intent to deceive Defendant.  (Paper 102, Ex. A, Plaintiff Decl. at ¶ 2).

In this analysis, the third element – deterrence – is the most problematic for Plaintiff.  The court is troubled that even after Judge Connelly partly granted Defendant's motion for sanctions, Plaintiff continued to delay discovery.  In the parties' Joint Status Report, filed on January 31, 2008, Plaintiff represented that he would produce copies of final tax returns filed with the IRS to Defendant by February 18, 2008.  Plaintiff failed to produce any tax returns by that date; instead, he produced summaries of financial information that he and his wife had prepared for the years 2002 to 2006, faxes of receipts, invoices, and other documentation related to his business expenses.  These papers, however, included only two documents related to his 2002 expenses and none related to Plaintiff's 2003 expenses.  Plaintiff explained that the absence of the 2002 and 2003 records was due to a flood in his basement.  He has failed to specify when this flood occurred, but presuming that it took place some time ago, it is unclear why he could not have relayed that information to Defendant at the outset.

Despite these concerns, the court is not convinced at this stage that Plaintiff's conduct amounted to bad faith. Notwithstanding delays, Plaintiff has provided as much financial

information as was possible and has explained the discrepancies in the reported income in his declaration.  He has clarified that some of the mistakes were due to clerical errors, as well as his accountant inadvertently providing the wrong 2006 tax return to Defendant.   Viewing the facts in the light most favorable to Plaintiff, the court accepts his assertion that he did not know at the time of his deposition that he had not filed tax returns for 2002 and 2003.  Moreover, Defendant will have every opportunity to delve into Plaintiff's financial records and attack his credibility at trial.  Accordingly, Plaintiff's lost profits claim will not be dismissed under Fed.R.Civ.P. 37(b).  For all the reasons previously discussed, the court also declines to dismiss Plaintiff's lost profits claim as an exercise of its inherent authority.

### 4.  Reasonable Certainty of Lost Profits' Claim

### a.  Lost Gross Revenues

Defendant further contends that Plaintiff's lost profits claim should fail as a matter of law because it cannot be determined with reasonable certainty.  Defendant first argues that Plaintiff's lost gross revenues are speculative.   Plaintiff claims lost gross revenues of $3.6 million, which is based on an assumed nine fights at an estimated gross revenue of $400,000 per fight.[7]  Defendant

---

[7]    The nine fights are based on the minimum term of the Promoter/Boxer Agreement, which provides that Jackson would arrange at least three bouts per year for Plaintiff for a period of three years.  (Paper 100, Ex. 1 at 1-2).  In addition, the Agreement
(continued...)

argues that Plaintiff cannot establish that he would have had nine fights in three years because Plaintiff was routinely injured or recovering from knee or shoulder injuries.  He points out that Cary Redlin, Plaintiff's personal assistant, stated that Plaintiff suffered from a number of injuries over the course of his boxing career, including a hyperextended elbow, a cracked rib, ruptured ear drums, and a torn tendon.  (Paper 100, Ex. 11, Redlin Dep. at 57).  Redlin also indicates that Plaintiff had two shoulder surgeries and a knee surgery.

In addition, Defendant insists that Plaintiff has no basis to support the $400,000 per fight figure he claims he is due because the only time that the Promoter/Boxer Agreement provided for a $400,000 purse was in the event that Plaintiff was the champion and was defending a qualifying title.  (Paper 100, Ex. 1 at ¶ 5c). John W. Wills, Defendant's expert, argues that a more reasonable amount is $117,000 per bout, which he calculated by taking the average of the four fights Plaintiff listed in his interrogatory responses.

---

[7](...continued)
states that Plaintiff would receive $400,000 or 45% of the total negotiated assuming that Plaintiff was the champion and was defending the championship in that specific bout.  In "non-title" fights, Plaintiff was to receive $275,000, inclusive of training expenses.  Significantly, the agreement also contained a provision extending its term indefinitely in the event that Plaintiff were to become a titleholder.  As noted, Plaintiff became the WBA champion on December 9, 2000, his first match after the agreement was executed.

Plaintiff contends that the contract stated that there would be three fights per year, and that Plaintiff therefore had every reason to believe that he would participate in nine fights total over the course of three years.  In addition, Plaintiff asserts that the $400,000 per fight figure is reasonable in light of the fact that he became the World Cruiserweight Title Holder on the same date the agreement became effective.  Moreover, Cedric Kusner, Plaintiff's expert witness, stated that he promoted approximately twenty bouts for Plaintiff over the last ten years, and that Plaintiff earned between $600,000 to $1,000,00 for each.  (Paper 102, Ex. B, Kusner Dep. at 50).

It is apparent that the proper measure of lost profits is a highly contentious issue, but the court is not convinced at this point these damages cannot be determined with reasonable certainty. Accordingly, it is properly an issue for the trier of fact.

**b.  Significant Avoided Expenses**

Defendant also argues that Plaintiff's lost profits claim cannot succeed because Plaintiff did not take into account significant avoided expenses.  Defendant points out that Plaintiff has only included one category of boxing expenses that constitute avoided expenses, namely, his expenses to trainers, advisors, and coaches.  According to Defendant's damages expert, "there are numerous other expenses that would be incurred in conjunction with a professional fight," including daily training expenses, travel

53

and related costs, manager compensation, fees withheld by promoters to cover incidental expenses, and "sanctioning fees." (Paper 100, Ex. 5, Wills Report at 9-10).  Defendant further observes that Plaintiff's tax returns identify significant business expenses in addition to the expenses paid to his trainers, advisers and coaches.  Plaintiff counters that Wills is not qualified to testify on such expenses because he is not familiar with the boxing industry.

Defendant's contention that expenses to trainers, advisors, and coaches cannot be the only expenses that Plaintiff avoided by not participating in bouts may well be logical, but, again, that issue will be reserved for the trier of fact.

### c.  Mitigated Damages

Defendant contends that Plaintiff has not provided sufficient information regarding his actual income to assist a finder of fact in determining the extent to which Plaintiff mitigated damages. Defendant specifically references the income that Plaintiff allegedly failed to report.  Plaintiff counters that Defendant's allegations focus mainly on marketing agreements entered to promote a bout, such as public appearances or wearing logos or other advertisements, and that this issue has already been addressed.

While not perfect, Plaintiff has now provided the available information related to his actual income.  The lost profits claim will not be stricken.

### d.  Loan Interest Claim

In his answers to interrogatories, Plaintiff indicated that he was asserting a damages claim against Defendant for the interest expenses that Plaintiff allegedly incurred after he was "forced to borrow money for basic living expenses" because Defendant failed to arrange any bouts on Plaintiff's behalf.  (Paper 98, Ex. 17 at 8-10).  Defendant contends that Plaintiff's loan interest claim should be dismissed under the clean hands doctrine, Fed.R.Civ.P. 41(b), Fed.R.Civ.P. 37(b), and pursuant to the court's inherent authority.  Defendant argues that Plaintiff did not disclose in his interrogatory responses either the fact that he had received a $150,000 loan from Hugh Sibley, or that, by the terms of that loan, over $105,000 of that debt had been forgiven.  Moreover, Defendant's damages expert explains that the income component of the Sibley loan far exceeds Plaintiff's claimed interest expenses of $9,313.  (Paper 98, Ex. 16, Wills Report at 12-14).  Defendant further observes that in his interrogatory responses in the *Hill v. Jackson* litigation, Plaintiff confirmed that he had received $150,000 from Sibley.  (Paper 100, Ex. 13 at 2).

In his declaration, Plaintiff states that he only received $50,000 from Sibley, not $150,000.  (Paper 102, Ex. A., Plaintiff Decl. at ¶ 10).  He contends that there was a typographical error in his interrogatory responses in the *Hill v. Jackson* litigation. (*Id.*).  In addition, Plaintiff states that the $50,000 was not a

loan in the sense that there was no requirement to pay it back in full; rather, Plaintiff argues, the money was a business investment on Sibley's part.

There is a genuine issue of material fact as to the amount of money Sibley gave Plaintiff, as well as the terms of their arrangement.  Accordingly, Defendant's motion will be denied with respect to the loan interest damages claim.

## III.  Motions to Seal

Plaintiff and Defendant have filed several motions to seal. (Papers 97, 99, 106 and 107).  The motions must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections.  The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties.  Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court.  If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

There is a well-established common law right to inspect and copy judicial records and documents.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  If competing interests outweigh the public's right of access, however, the court may, in its

discretion, seal those documents from the public's view. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Prior to sealing any documents, the court must provide notice of counsel's request to seal and an opportunity to object to the request before making its decision. *Id*. Either notifying the persons present in the courtroom or docketing the motion "reasonably in advance of deciding the issue" will satisfy the notice requirement. *Id*. at 234. Additionally, the court should consider less drastic alternatives, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, the court should provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id*. at 235.

Defendant seeks to seal the following documents: (1) the motion to dismiss Plaintiff's lost profits claim and accompanying exhibits, (2) Exhibit 5 to Defendant's motion for summary judgment, an expert report of John Wills, Managing Director of Dispute Analytics LLC, and (3) the reply memorandum in support of Defendant's motion to dismiss Plaintiff's lost profits claim and accompanying exhibits. Plaintiff has filed a renewed motion to seal his opposition to Defendant's motion to dismiss Plaintiff's lost profits claim and the accompanying exhibits. The court originally issued a paperless order denying Plaintiff's motion to seal for failure to comply with Local Rule 105.11. (Paper 105).

57

Plaintiff and Defendant submit that these documents contain sensitive financial and tax information that is protected pursuant to this court's confidentiality order.   In addition, Defendant contends that certain exhibits to his motion to dismiss contain social security numbers and dates of birth that should be redacted if the court were to decide not to place these documents under seal. Plaintiff contends that alternatives to sealing would not provide sufficient protection because any process less than sealing would make public the very confidential financial information that is protected pursuant to the court's confidentiality order.  All of the motions to seal are unopposed.

All motions to seal comply with Local Rule 105.11, and will be granted.   The court will not, however, undertake to determine whether any portion of this opinion contains information that is under seal.  Accordingly, the opinion will be filed under seal and the parties are directed to review it and suggest jointly any necessary redactions from the opinion that should be made before it is released to the public docket.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part, Defendant's motion to dismiss Plaintiff's lost profits claim will be denied,

and the motions to seal filed by both parties will be granted.   A
separate Order will follow.

                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge